# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

SAMANTHA C.,[1]

        Plaintiff,

vs.

KILOLO KIJAKAZI
Acting Commissioner of Social Security,

        Defendant.

No. 5:21-CV-4008-KEM

**MEMORANDUM OPINION
AND ORDER**

---

Claimant seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f). Claimant argues that the administrative law judge (ALJ) erred in failing to resolve an apparent conflict between reasoning-level-three work and simple and routine tasks; in evaluating her subjective complaints and the medical opinions; and in developing the record with medical evidentiary support for the RFC. Claimant also raises an Appointments Clause challenge. **I reverse** the Commissioner's decision and **remand** for an award of benefits for a closed period and other further proceedings.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

# I. BACKGROUND[2]

Claimant graduated with her bachelor's degree in nursing in 2012. AR 254.[3] She worked as a staff NICU[4] nurse for about three years before becoming a travel nurse in August 2015. AR 255. As a travel nurse, she generally worked thirteen-week stints at a time, and she would also occasionally pick up shorter, "rapid response" jobs through a different employer—for example, working for two days at a hospital to provide coverage during a sudden strike. AR 44. Her last longer-assignment job ended on April 21, 2018, in California; she planned to take a break to see her parents in Iowa, staying with them for about a month, and to vacation in Germany (as a travel nurse, she earned more than double her hourly rate as a staff nurse, allowing her to take long periods of unpaid time off). AR 45-46, 265-66. She testified that she worked for two days on a rapid response shift in California shortly after her main assignment ended but has not otherwise worked since; earnings records show one day's worth of work from the fourth quarter of 2018 (which might be in error). AR 13, 45-46, 247.

On Friday, May 11, 2018, Claimant went to the emergency room, complaining of back pain beginning the day prior. AR 468. Claimant followed up with her primary care provider several times throughout the month of May, and she also underwent physical therapy; she canceled her planned vacation due to pain. Doc. 14; AR 453. On June 5, she additionally reported difficulties with urination. *Id.*; AR 441. Her primary care provider referred her to a neurosurgeon, who provided a catheter on June 8, 2018, and performed back surgery on June 12, 2018. *Id.*; AR 392.

At appointments in July 2018, while still taking post-surgery narcotics, Claimant reported that her back pain had improved. *Id.* She did report in late July, however, that

---

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 14).

[3] "AR" refers to the administrative record, filed at Docs. 12-2 to 12-10.

[4] Neonatal intensive care unit.

2

she continued to self-catharize herself twice a day, although she believed her bladder control was improving. AR 429. Her neurosurgeon indicated that he would taper her Duragesic (fentanyl) patches to a lower dosage, with the plan to switch to an even lower dosage of Percocet (oxycodone and acetaminophen). AR 380.

In mid-August, Claimant's father died unexpectedly. AR 421. Claimant had been living with her parents, and after her mother discovered her father in cardiac arrest, Claimant performed CPR[5] while waiting for the ambulance to arrive. AR 421, 641. When Claimant met with her primary care provider in early September 2018, she said that she had been "able to get away from straight cathing herself up until about 3 weeks ago and now is having [to] straight cath again." AR 421. She also reported increased back pain, which her provider posited could be related to the physical and psychological trauma of her father's passing. AR 424. A nonantalgic gait was observed. AR 376.

Claimant began suffering depression, anxiety, and PTSD.[6] She started psychotherapy in mid-September, which required her to drive sixty-five miles one way twice a week for appointments. AR 502, 857. She ultimately changed to an online therapy provider in January 2019 due to a change in health insurance. *See* AR 401, 502, 855-59.

Claimant underwent an MRI[7] in September 2018. In early October, Claimant's neurosurgeon noted that the MRI did not show a tear that would benefit from surgery; he opined that Claimant probably strained her back injury when performing CPR, resulting in fatigue-related muscle spasms. AR 372-73. He observed mild gait disturbance and issued a six-month handicap parking permit, directing her to continue her current medications and follow up in a few weeks. *Id.*

---

[5] Cardiopulmonary resuscitation.

[6] Post-traumatic stress disorder.

[7] Magnetic resonance imaging.

In mid-October 2019, Claimant's neurosurgeon noted she continued to suffer from low back pain, despite taking 10 milligrams of oxycodone six times a day, as well as Valium (diazepam), baclofen, and Neurontin (gabapentin) for muscle spasms. AR 369-70. He also noted Claimant reported issues related to "urologic function and bladder spasms." *Id*. A few days later, Claimant met with a urologist. Doc. 15. She reported urinating eight to fourteen times a day with the sudden desire to urinate five times a day, estimating leakage once a week as a result. AR 340. The urologist directed her to continue to use a catheter and provided a topical anesthetic to improve comfort. AR 343. He noted her symptoms might continue to improve with distance from surgery. *Id*. The next week, Claimant visited her primary care provider, noting that she would be starting biofeedback[8] to see if it would help her regain control of her bladder. AR 415. She also reported continued back pain and catheter use. *Id*. Her primary care provider increased her gabapentin dosage at her request. AR 419.

At an appointment with her primary care provider in November 2018, Claimant continued to report back and right leg pain. AR 410. She also stated she was still having to use a catheter in the morning and afternoon, although she could urinate some on her own; she noted that her insurance would not cover the bladder retraining recommended by the urologist. *Id*. She also stated she had been accepted into a master's program at Johns Hopkins. *Id*. She continued to report pain in December 2018 and indicated she was working on disability paperwork (she filed for benefits a few days later). AR 403.

Claimant visited the neurosurgeon in early January, who increased her oxycodone dosage. *See* AR 397, 504. She reported to her primary care provider the next week that the increased dosage helped her pain, although her provider noted an antalgic gate and

---

[8] "During biofeedback, [a person] is connected to electrical sensors that help [the person]" learn how to make subtle changes to the body to better control its functions. *Biofeedback*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/biofeedback/about/pac-20384664#:~:text =Biofeedback%20is%20a%20technique%20you,receive%20information%20about%20your%2 0body (last updated March 18, 2021).

use of a cane, which Claimant reported she was using full time. AR 397, 401. Claimant still needed to use a catheter, stating that she had improved for a while and could urinate on her own, but that in the last few months, she had needed to catheterize again. *Id.* In reports to the Social Security Administration around this time, Claimant's mother noted Claimant used a catheter several times a day, and Claimant stated she used a catheter daily and frequently suffered urgency. AR 273, 281.

Claimant met with her primary care provider in February and March 2019. Doc. 15. At both appointments she indicated she had decreased her oxycodone dosage and suffered recent falls, despite using a cane. AR 552, 559, 564; *see also* AR 520, 564. She was using diclofenac gel on her low back, which was helpful; she could not use many pain medications due to undergoing gastric bypass surgery in the past. AR 559. She stated she had to shift positions frequently and estimated she could not sit for longer than five to ten minutes (she reported being most comfortable reclining). AR 552, 560. She continued to self-catheterize. AR 553, 560. In March, her primary care provider began to taper her off Valium, which she had been taking for muscle spasms and anxiety, and prescribed Rexulti (brexpiprazole) instead (she ultimately did not begin this medication because her health insurance would not cover it). AR 566, 580. Her primary care provider wondered if her dizziness and increased falls were due to Chiari malformation,[9] a condition Claimant had been previously diagnosed with that had been controlled by

---

[9] "'Chiari malformation is a condition in which brain tissue extends into the spinal canal. It occurs when part of the skull is abnormally small or misshapen, pressing on the brain and forcing it downward.' A person may not suffer any symptoms as a result of Chiari malformation. The most common symptom is severe headaches in the back of the head . . . . If a larger amount of brain tissue extends into the spinal canal, a person with Chiari malformation may also suffer dizziness, trouble with balance, muscle weakness, a tingling or burning sensation in the fingers or toes, vision issues, or trouble sleeping. Symptoms may come and go." *Scott v. Saul*, No. 19-CV-4037-LRR-KEM, 2020 WL 7222107, at *1 (N.D. Iowa Apr. 24, 2020) (cleaned up) (quoting *Webb v. Berryhill*, 294 F. Supp. 3d 824, 834 n.7 (D.S.D. 2018)), *report and recommendation adopted*, 2020 WL 60676321 (Oct. 15, 2020).

5

medications. Her primary care provider referred Claimant to aquatherapy, which she attended from March to October 2019; it required her to drive sixty miles one way. Doc. 15; AR 48.

In early April 2019, Claimant met with her neurosurgeon. AR 525-26. He did not think a neurostimulator was a viable pain-management option given that chronic fatigue-related muscle spasms caused Claimant's degenerative disc disease, spondylosis, and wall tears. *Id.* He indicated that her condition might require surgery in the future (as a last resort). *Id.*

Claimant met with her primary care provider twice in April 2019. At both appointments, she noted difficulties weaning her oxycodone dosage due to pain. AR 580, 586, 598, 603. She also asked about switching from gabapentin to Lyrica (pregabalin) based on online research, and her primary care provider acquiesced to this request. *Id.*; AR 646.

In early May 2019, Claimant again met with her neurosurgeon. She reported worsening pain radiating toward the right low back (previously, her pain had radiated to the left). Based on the changing pattern of pain distribution, the neurosurgeon ordered an MRI (which Claimant underwent in June 2019). AR 530-31; Doc. 15. A mid-May 2019 physical therapy record reflects that Claimant walked with a slow gait and used a cane. AR 694. Later that month, she visited her primary care provider due to a urinary tract infection (UTI). AR 704. She reported better bladder control and "not having to straight cath near as much." *Id.* She also noted slowly improving pain and being less reliant on her cane. *Id.*

Claimant began visiting the pain clinic for pain management and help tapering her narcotics dosage in May 2019. Doc. 15. She went to the clinic monthly to refill her oxycodone prescription, the dosage of which lessened each month. Doc. 14. She generally reported back pain at five or six out of ten at these appointments and tolerating the oxycodone taper. Doc. 14; *see also* AR 632. In July 2019, she reported using the

cane minimally, stating she only needed an assistive device with shopping for long periods of time.  AR 728.  In September 2019, Claimant noted that based on a recent EMG[10] showing Ehlers-Danlos syndrome,[11] her neurosurgeon recommended a selective nerve root block injection without steroids.  Doc. 14.  Her pain clinic provider asked whether she had ever tried nonpharmacological options such as kinesio taping or alpha-stim; Claimant responded yes to the former but no to the latter.  AR 801.

Later in September, Claimant met with her primary care provider.  AR 754.  She reported that her back was doing "fairly well," that she was "doing okay" with the oxycodone taper, and that she had not noticed increased pain on the lower dosage of narcotics.  *Id.*  Her primary care provider also indicated Claimant's depression and anxiety symptoms had stabilized.  *Id.*

After the pain clinic confirmed the treatment plan with Claimant's neurosurgeon, Claimant received an injection in October 2019.  Doc. 14.  If the injection provided relief, Claimant would be a good candidate for a spinal cord stimulator.  *Id.*  Claimant indicated she would lose her insurance at the end of the month.  AR 796.

Claimant saw her primary care provider in February 2020.  Doc. 15.  She reported that her low back was doing okay and that she had not noticed an increase or decrease in pain, despite the oxycodone taper.  AR 815.  She reported radiating pain that came and went, as well as muscle fatigue in her back.  *Id.*  She asked to return to physical therapy

---

[10] Electromyography.

[11] "Ehlers-Danlos syndrome is a group of inherited disorders that affect [a person's] connective tissues — primarily . . . skin, joints and blood vessel walls. Connective tissue is a complex mixture of proteins and other substances that provide strength and elasticity to the underlying structures in your body. . . . [S]ymptoms include [o]verly flexible joints[,] . . . [s]tretchy skin[,] . . . [and f]ragile skin." ***Ehlers-Danlos syndrome***, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125#:~:text=Ehlers%2DDanlos%20syndrome%20is%20a,underlying%20structures%20in%20your%20body (last updated Aug. 25, 2022).

7

(which she had completed in October). *Id.* She said that she still had to use a catheter at night but was able to urinate fairly well throughout the day. *Id.* Claimant followed up with the urologist, noting that it became more difficult to empty her bladder as the day went on. AR 822. Nevertheless, Claimant indicated she had been able to reduce her need to use a catheter to twice per day. AR 826. Claimant also participated in several physical therapy sessions in March 2020, until paused by the Covid-19 pandemic. Doc. 14.

In mid-March 2020, Claimant met with a psychiatric medication provider, noting mild to moderate mental-health symptoms. AR 845. She reported using a catheter once daily to ensure her bladder was completely empty, but otherwise noted her urinary symptoms had dissipated. AR 847.

Claimant filed DI and SSI applications on December 26, 2018. Doc. 14. In both applications, she alleged that her disability began on April 21, 2018, her last day of work. *Id.* The Social Security Administration denied Claimant's claims on initial review in April 2019 and on reconsideration in August 2019. AR 58-133. Claimant requested review before an ALJ, and the ALJ held a telephone hearing on May 14, 2020, at which Claimant and a vocational expert (VE) testified. AR 10, 31-32. On May 22, 2020, the ALJ issued a written opinion, following the five-step process outlined in the regulations.[12] AR 10-25. The ALJ found Claimant suffered from the following severe impairments:

---

[12] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920.** The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

degenerative disc disease, mild obesity after bariatric surgery in 2016, depression, and anxiety. AR 13. For purposes of determining Claimant's ability to perform her past work (at step four) and other work (at step five), the ALJ determined Claimant's residual functional capacity (RFC)[13]:

> [Claimant] has the [RFC] to perform sedentary work . . . except she is able to perform work that requires no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; with no work on ladders. She must avoid concentrated exposure to hazards. The claimant is limited to entry level, simple, routine tasks.

AR 15.[14] Based on her RFC, age, education, and work experience, the ALJ found that Claimant could not perform her past work as a nurse. AR 23. But the ALJ found that other jobs existed in significant numbers in the national economy that Claimant could perform, such as telephone quotation clerk, charge account clerk, and call out operator. AR 24. Therefore, the ALJ found Claimant not disabled. AR 24.

Claimant appealed the ALJ's decision to the Appeals Council. The Appeals Council denied review on December 10, 2020 (AR 1-3), making the ALJ's decision that Claimant was not disabled the final decision of the Commissioner.[15] Claimant filed a timely complaint in this court (Doc. 1).[16] The parties briefed the issues (Docs. 15, 19, 22, 28-30) and consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 6).

---

[13] RFC means "the most that a claimant can do despite her limitations." **Sloan v. Saul**, 933 F.3d 946, 949 (8th Cir. 2019).

[14] By definition, sedentary work requires the ability to occasionally lift ten pounds, to walk and stand for two hours in an eight-hour day, and to sit for six hours in an eight-hour day. **20 C.F.R. §§ 404.1567(a), 416.967(a)**; **SSR 96-9p**, 61 Fed. Reg. 34478, 34480 (July 2, 1996).

[15] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[16] *See* **20 C.F.R. § 422.210(c)**.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[17] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[18] The court "do[es] not reweigh the evidence or review the factual record de novo."[19] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[20]

Claimant argues that an unresolved conflict exists between Claimant's RFC limitation to "entry level, simple, routine tasks," and the VE's testimony that Claimant could perform jobs requiring a reasoning level of three. Claimant also challenges the ALJ's evaluation of her subjective complaints and the medical opinions. Claimant argues that the ALJ failed to fully develop the record and that some medical evidence does not support the ALJ's RFC determination. Finally, Claimant argues the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution.

### A. Conflict with the Dictionary of Occupational Titles (DOT)

The ALJ's RFC limited Claimant to "entry level, simple, routine tasks." AR 15. But the three jobs the ALJ found Claimant could perform, in reliance on the VE's testimony—telephone quotation clerk, charge account clerk, and call out operator—all require a reasoning level of three, per the DOT.[21] Claimant argues that the VE's testimony that she could perform reasoning level three work conflicted with her ability

---

[17] **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[18] **Kirby**, 500 F.3d at 707.

[19] **Naber v. Shalala**, 22 F.3d 186, 188 (8th Cir. 1994).

[20] **Robinson v. Sullivan**, 956 F.2d 836, 838 (8th Cir. 1992).

[21] **DOT §§ 205-367-014**, **237.367-014**, **237.367-046**.

to perform only "entry level, simple, routine tasks." Thus, Claimant argues remand is required for the ALJ to resolve this apparent conflict between the VE's testimony and the DOT.

> I previously noted in *Dudrey v. Kijakazi*:

> I have previously addressed similar arguments and noted that circuit courts and district courts (within and without the Eighth Circuit) are split. I have concluded that there is Eighth Circuit precedent supporting both sides and that the Eighth Circuit has not definitively weighed in on the issue. At bottom, I have noted that "whether an inconsistency exists depends on the facts of each case" (while still recognizing that the caselaw cannot be reconciled).[22]

Since then, the Eighth Circuit has weighed in once again. In *Galloway v. Kijakazi*, the ALJ found the claimant "limited to jobs where she can understand, remember, and appropriately carry out simple instructions; use judgment in making simple work related decisions; [and] deal with changes in a routine work setting."[23] The claimant argued that the ALJ meant to find that she could not understand or carry out detailed instructions based on a sentence elsewhere in the ALJ's opinion.[24] The Eighth Circuit rejected this

---

[22] No. 20-CV-0079, 2022 WL 965396, at *7 (N.D. Iowa Mar. 30, 2022).

[23] ***Galloway v. Kijakazi***, No. 21-3691, 2022 WL 3453553, at *1 (8th Cir. 2022) (to be published in the Federal Reporter).

[24] ***Id.*** at *2. As in *Galloway*, here, the Claimant argues that the ALJ meant to include additional limitations in Claimant's RFC, since the ALJ found persuasive the opinions of the state agency consultants, who opined that Claimant suffered moderate limitations in understanding, remembering, and carrying out detailed instructions and in responding to changes in the work setting. AR 73-74, 130-31. The state agency consultants ultimately concluded, however, that Claimant could perform unskilled work. *Id.* Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." **20 C.F.R. §§ 404.1568, 416.968**. Unskilled work also requires the ability "to deal with changes in a routine work setting." **SSR 85-15**, 1985 WL 56857, at *4 (Jan. 1, 1985). By limiting Claimant to "entry level, simple, routine tasks," the ALJ limited Claimant to unskilled work; her RFC is not inconsistent with the opinions of the state agency consultants. *See **Hosch v. Colvin***, No. C15-2014-CJW, 2016 WL 1261229, at *5 (N.D. Iowa Mar. 30, 2016) (noting unskilled work involves "simple, routine, repetitive tasks"); *see also **Freeman v. Colvin***, No. 13-5108, 2014 WL 4467265, at *1 (W.D. Ark. Sept. 10, 2014) (noting the ALJ recognized an

---

argument.[25]   In addition, the Eighth Circuit noted two of the jobs the ALJ ultimately found the claimant could perform required level two reasoning, or the ability to carry out 'detailed but uninvolved instructions,' which the court had previously held consistent to an RFC limiting a claimant to "'carrying out simple job instructions' for 'simple routine and repetitive work activity.'"[26]   The court noted in footnote that the remaining job required a reasoning level of three but did not explicitly address reasoning-level three jobs separately from reasoning-level two jobs.[27]   The court concluded:

> Because the sentence [the claimant] relies upon can be harmonized with the ALJ's hypothetical question and the [RFC] determination, we do not believe that the ALJ intended to find that [the claimant] lacked capacity to carry out detailed instructions.  Thus, no apparent conflict exists between the vocational expert's testimony and the DOT listings.[28]

Although this case could be read as support that there is not an apparent conflict between a limitation to simple work and reasoning-level-three jobs, once again, I do not find that the Eighth Circuit directly addressed the issue.  Rather, the court's focus was on the ALJ's intent in formulating the RFC.

---

ability "to perform simple, repetitive tasks" is "tantamount to unskilled work"); ***Brown v. Astrue***, No. 10-03113-CV-S-DGK, 2011 WL 2582555, at *2 (W.D. Mo. June 29, 2011) (noting the ALJ recognized the ability to perform "simple repetitive tasks" is "commensurate with unskilled work activity"); ***Strang v. Barnhart***, No. C04-4037-MWB, 2005 WL 1500844, at *11 (N.D. Iowa June 23, 2005) (noting the ALJ recognized the ability "to perform simple, repetitive tasks on a sustained basis[ is] consistent with unskilled work activity") (report and recommendation).

Claimant also argues the opinion of psychological consultative examiner Michael Baker, PhD, although "vague," support at minimum "a difficulty with complex, if not detailed, instructions and tasks."  Again, the ALJ could interpret Dr. Baker's opinion as supporting the ALJ's finding of moderate limitations in concentration, persistence, and pace, and RFC limitation to simple, routine tasks.  AR 22.

[25] ***Id.*** at *3.

[26] ***Id.***

[27] ***Id.*** at *3 n.2.

[28] ***Id.*** at *3.

Here, like the majority of circuit courts to address the issue, I find that an apparent conflict exists between the ALJ's limitation to "entry level, simple, routine tasks" and the ability to perform work requiring a reasoning level of three.[29] The VE did not explain the conflict in any way, denying that any conflict existed and failing to acknowledge that the cited jobs required a reasoning level of three (AR 55).[30]

In addition, here, I find that the failure to take any testimony from the VE about the apparent conflict requires remand. Claimant's past work as a skilled nurse does not demonstrate an ability to perform level-three reasoning jobs, since her mental capabilities have deteriorated since that time (it is undisputed Claimant's RFC limitation to "entry level, simple, routine tasks" precludes her past work).[31] And the error is not harmless, because all three of the jobs the ALJ found Claimant could perform require level-three reasoning.[32]

Accordingly, I find that remand is required for the ALJ to resolve the apparent conflict between Claimant's mental limitations and the ability to perform work that the DOT states requires a reasoning level of three. On remand, the ALJ should obtain additional VE testimony that details the mental demands of work as a telephone quotation clerk, charge account clerk, and callout operator and that explains why a person limited to simple and routine tasks would be able to perform work the DOT states requires "apply[ing] commonsense understanding to carry[ing] out instructions furnished in

---

[29] See **Dudrey**, 2022 WL 965396, at *8 & nn. 36-40 (collecting cases); see also **Social Security Administration, Office of Hearing Operations, Office of the Chief ALJ, Vocational Expert Handbook** 39 (June 2020), available at: https://www.ssa.gov/appeals/public_experts/Vocational Experts (VE) Handbook-508.pdf (guidance from the Social Security Administration for VEs provides: "There is an apparent conflict between a job that requires a reasoning level 3, and a hypothetical individual that can perform only 'simple' or 'repetitive' tasks. Be prepared to explain how the hypothetical individual could perform this job.").

[30] Cf. **Welsh v. Colvin**, 765 F.3d 926, 927-30 (8th Cir. 2014).

[31] Cf. **Hillier v. Social Security Administration**, 486 F.3d 359, 366-67 (8th Cir. 2007).

[32] Cf. **Clay v. Barnhart**, 417 F.3d 922, 931 (8th Cir. 2005).

written, oral, or diagrammatic form" and "deal[ing] with problems involving several concrete variables in or from standardized situations."[33]

## B. Subjective Complaints

Claimant argues the ALJ erred by not fully crediting her statements regarding the limitations caused by her physical and mental impairments. When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[34] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[35] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest the credibility finding on "objective medical evidence to the contrary"[36] or "inconsistencies in the record as a whole."[37] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[38]

Claimant testified that she has moderate to severe chronic pain. AR 47. She explained that reinjuring her back performing CPR on her father "caused more chronic

---

[33] **DOT, App. C**.

[34] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997); ***Polaski v. Heckler***, 739 F.2d 1320, 1322 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).

[35] ***Black***, 143 F.3d at 386.

[36] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[37] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[38] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

nerve damage and an increase in the granulation tissue or scar tissue in that space where the discectomy was performed." AR 51. She stated she can only lift ten pounds or occasionally twenty pounds. AR 47. She purports to have chronic pain, frequent muscle spasms, nerve pain, overall muscle fatigue (especially in the core to left leg), has trouble sitting and standing for long periods, and has to sleep in a recliner because she cannot lie flat. AR 47, 50. She admitted she has not used a cane since September or October of 2019 but reported occasional leg weakness that can lead to falls if not remedied. AR 51. She testified that she has to catharize frequently due to an inability to control her bladder—two times during the day and once at night, but more frequently (four to five times a day) when stressed. AR 47, 50. She stated she cannot catheterize on a schedule, explaining its similar to voiding on your own, "when you have to go, you have to go." AR 50. She said catheterization takes fifteen to twenty minutes. AR 50-51.

The ALJ found the claimant's subjective complaints inconsistent with the evidence of record. AR 21. The ALJ noted that Claimant underwent back surgery, which "weigh[ed] somewhat in the claimant's favor," but that subsequent to surgery, there were no significant radiologic or physical exam findings. AR 20. The ALJ also found that "medications have been relatively effective in controlling the claimant's symptoms." *Id.* The ALJ noted the treatment records reflect great improvement as time went on with various treatment methods. *Id.*

Substantial evidence supports that the Claimant's functional abilities improved over the course of the relevant time period. Claimant attended physical therapy from March 2019 to October 2019, and she also began taking Lyrica instead of gabapentin in April 2019. At physical therapy appointments, Claimant often reported feeling good after treatment (AR 588, 690, 711, 714, 767), that the pool exercises felt good (AR 594, 609, 702, 726, 737, 743, 746, 752), or that dry needling was helpful (AR 711, 720, 723, 734, 740, 746, 749, 752). Her physical therapist also reported with regularity things such as "[Claimant] has made significant progress since beginning physical therapy" (AR

15

695) and that "dry needling seems to help her back for up to a couple weeks" (AR 745). By her last day of physical therapy in October 2019, Claimant "ambulate[d] into the clinic without an assistive device and ha[d] minimal antalgic gate." AR 771. Claimant reported that "her [activities of daily living] have greatly improved and her ability to do activity 'tenfold'." AR 770. Further, she "no longer had significant forward trunk flexion or forward head posture." AR 771. Her physical therapist noted that claimant "is doing very well in her progress" and gave his assessment:

> At this time patient has met all of her goals which included to be able to walk 6 minutes, be able to do at least 10 sit to stands, be able to walk a mile through the course of the day, and being able to perform traveling tasks such as vacations. She has done very well with all her exercises and she has been consistent with them. She is good with her home exercises with instruction. Overall prognosis at this time is excellent for her to continue on her own and continue with her home exercise program.

AR 771-72.

Claimant tapered her oxycodone dosage throughout summer and fall 2019, and she reported tolerating it well. AR 632, 635, 796, 799. She stated that she did not have increased pain without the narcotics. AR 754, 815. In late May, she told her primary care provider that her pain was slowly improving and that she was not as reliant on her cane (although she was still using it). AR 704. In addition, in September 2019 and February 2020, she told her primary care provider that her back pain was doing fairly well, and he noted her mental-health symptoms had stabilized. *Id.*

But while substantial evidence supports the ALJ's finding that Claimant was less limited at the time of the hearing, the ALJ failed to consider whether a closed period of disability might be applicable. An ALJ may "award Social Security benefits either on a continuing basis, or for a "closed period."[39] In this way, disability is not an "all-or-

---

[39] ***Harris v. Sec'y of Dept. of Health & Human Servs.****, 959 F.2d 723, 724 (8th Cir. 1992)).

nothing" determination.[40] A claimant may be eligible for benefits for a closed period if unable to work for at least twelve months due to disability.[41]

Claimant first went to the emergency room for back pain on May 11, 2018. She underwent surgery in mid-June 2018. Although she initially reported surgery improved her radicular symptoms and pain, she reinjured her back and began suffering depression and anxiety upon the death of her father on August 15, 2018. She needed to use a cane from at least January to mid-May 2019. With physical therapy, Lyrica, and a change in mental-health medications, however, she began reporting improvement in late May and June 2019, and by the time she completed physical therapy in October 2019, she reported feeling a lot better.

Particularly with respect to Claimant's urinary issues caused by her back symptoms, substantial evidence does not support that there was no twelve-month period in which Claimant would not have needed to take breaks at work to use a catheter or otherwise use the restroom. Claimant first reported increased difficulty urinating on June 5, 2018, prior to her initial back surgery. AR 441. On June 8, she saw Dr. Jensen regarding this issue, who had a foley catheter placed as short-term management and performed surgery shortly thereafter. AR 392. Following her surgery, Claimant noted improvement in her bladder control but still reported using a catheter twice a day. AR 429. But after she strained her back on August 15, her inability to urinate returned, and she reported using a catheter. AR 421, 424. In October 2018, Claimant stated she urinated eight to fourteen times a day and leaked urine about once a week due to her inability to control her bladder. AR 340. From November 2018 to at least May 2019,

---

[40] *Id.*

[41] *See* **42 U.S.C. § 423(d)(1)(A)**; *see also* **Swanson v. Astrue**, No. CV 09-1737 (MJD/JJK), 2010 WL 3118785, at *20 (D. Minn. May 3, 2010) (holding that "ALJ erred by failing to consider whether [p]laintiff was entitled to a closed period of benefits" when the plaintiff improved over the relevant time period), *report and recommendation adopted,* 2010 WL 3118691 (Aug. 4, 2010).

Claimant continued to complain that she had to use a catheter to urinate. AR 273, 281, 397, 401, 410, 553, 560, 693. By late May 2019, she reported better bladder control and not having to use the catheter as much. AR 704. In October 2019, she reported that she did not need to self-catheterize herself as frequently, and by February 2020, she reported only using the catheter at night. AR 728, 815.

Normal work allows for breaks every two hours, usually for fifteen minutes (unless the lunch break).[42] Claimant testified her need to self-catheterize could not be scheduled and would take fifteen to twenty minutes. The record reflects that prior to her improvement, Claimant suffered frequent UTIs and urinary urgency because of her use of a catheter and other urinary issues. AR 340, 394, 415, 434, 553, 704, 809.

The ALJ erred by failing to fully discuss and consider this evidence—the ALJ noted only that Claimant reported urinating eight to fourteen times a day in October 2018 and that she reported improvement in urinating during the day by February 2020. AR 17-18. The VE testified that no jobs would exist for someone with Claimant's limitations who would additionally need two unscheduled fifteen-minute breaks a day to catheterize herself. AR 56. The ALJ did not consider whether Claimant's symptoms were more severe for a twelve-month period, entitling her to disability benefits for a closed period.

Substantial evidence supports the ALJ's determination that by the time Claimant completed physical therapy in October 2019, Claimant could function as found by the ALJ in the RFC determination. The treatment records and Claimant's activities of daily living reflect that although Claimant suffered limitations, she improved to the point where she could perform sedentary work as found by the ALJ. But it is not entirely clear when Claimant improved to this point. The treatment records support that she suffered additional limitations than found by the ALJ for at least twelve months, from early May

---

[42] *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005); *see McMurray v. Astrue*, No. 08-5044-CV-SW-REL-SSA, 2009 WL 3052204, at *17 (W.D. Mo. Sept. 20, 2009), *aff'd,* 376 F. App'x 650 (8th Cir. 2010).

2018 (when she first went to the emergency room) to late May 2019. In particular, the evidence of record related to Claimant's urinary symptoms, when considered in conjunction with the VE's testimony, overwhelmingly supports that Claimant is entitled to disability benefits for at least a closed period.[43]

Substantial evidence does not support the ALJ's decision to disregard Claimant's statements of her symptoms for the entire relevant period. I find that Claimant is entitled to disability benefits for a closed period. I leave it to the Commissioner on remand to determine precisely when that closed period ended, based on the guidance in this order.

### C. Medical Opinions

Claimant also challenges the weight the ALJ gave to medical opinions. When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence."[44] For claims filed after March 2017 (like Claimant's), the ALJ no longer "assign[s] a specific weight to medical opinions."[45] Instead, the ALJ "evaluate[s] the persuasiveness of medical opinions" considering the following factors: (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is by a specialist; and (5) "other factors that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding

---

[43] *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

[44] **20 C.F.R. §§ 404.1527(b), 416.927(b).**

[45] *Revisions to Rules Regarding the Evaluation of Medical Evidence*, **82 Fed. Reg. 5844**, 5858 (Jan. 18, 2017); *see also* **20 C.F.R. §§ 404.1520c(a), 416.920c(a).**

of [the Social Security Administration's] policies and evidentiary requirements."[46]  The first two factors, supportability and consistency, are the most important.[47]  The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[48]

Claimant challenges the ALJ's evaluation of opinions from her primary care provider, Nurse Practitioner Patrick Pucelik (NP Pucelik), and treating neurosurgeon, Ric Jensen, MD, PhD.

### 1. NP Pucelik's Opinion

Claimant argues that the ALJ did not articulate sufficient reasons for finding NP Pucelik's opinion to be "of little persuasive value."  AR 21.  NP Pucelik wrote a letter in support of Claimant's disability application in April 2020 (after Claimant's symptoms had improved).  AR 853-54.  NP Pucelik said Claimant could only sit for 30 minutes at a time, stand for 45 minutes at a time, and walk 2 blocks.  NP Pucelik noted Claimant had to use a catheter, but acknowledged "[a]s time has passed[,] she has been able to lessen the number of times she needs to self-catheterize in a day."  *Id.*  NP Pucelik also indicated Claimant's mental-health problems affected her ability to focus and concentrate.  *Id.*

The ALJ discounted NP Pucelik's opinion as "vague and imprecise."  AR 21.  The ALJ also noted NP Pucelik's bias, since Claimant worked for him as a babysitter when she was growing up.  *Id.*  The ALJ noted that despite evidence that at the time of NP Pucelik's letter, Claimant's urinary symptoms had improved such that she was only using the catheter at night, NP Pucelik suggested she continued to suffer limitations related to

---

[46] **20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c)**.

[47] **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

[48] **20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2)**.

her bladder. *Id.* The ALJ also found NP Pucelik's opinion that Claimant could only sit for forty-five minutes at a time inconsistent with evidence that she drove an hour each way to therapy or aquatherapy for most of the relevant time period. *Id.*

The ALJ identified specific inconsistencies between NP Pucelik's treatment records and the overall medical evidence of record, which are supported by substantial evidence. The ALJ also noted the imprecise nature of NP Pucelik's letter and his potential bias. I do not find that the ALJ erred in evaluating NP Pucelik's opinion.

### 2. *Dr. Jensen's Opinions*

Claimant also challenges the ALJ's evaluation of Dr. Jensen's opinions. In his first follow-up after surgery, Dr. Jensen directed that Claimant "will maintain in an off work status" until her next appointment in approximately three weeks. AR 385. In late July 2018, Dr. Jensen opined that "a return to full work status without restrictions will likely require additional physical therapy in September and a planned return to work without restrictions in October of 2018." AR 380. Claimant would subsequently reinjure her back on August 15. AR 372. In late August 2018, Dr. Jensen noted he "had intended to return [Claimant] to work in late October," but "[t]his may be delayed depending on her recovery at this juncture." AR 376. In late September 2018, Dr. Jensen instructed Claimant "to maintain in an off work status until further notice," and he issued her a handicapped parking permit for six months based on her limited mobility to less than 200 feet. AR 371-73. In mid-October 2018, Dr. Jensen opined that Claimant's "[o]verall functional capacity has remained stable, albeit . . . at a level whereupon I do not believe that she will be capable of gainful employment as a nurse (at this juncture in time)." AR 369-370. As Claimant continued to suffer back issues, Dr. Jensen stated on January 24, 2019:

> At this time, and for the purposes of [Claimant's] ongoing employment status, I do not believe that [Claimant] will be capable of performing gainful employment for at least the coming 6 to 12 months. I base this upon her current level of

functional capacity and her Oswestry scale at a level of 38 (which has maintained at a level of 38 for at least the 6 months). [Claimant] clearly has issues relative to functional capacity loss following an injury to her lumbosacral spine in the post-operative phase, per the performance of CPR upon her father. . . . In any event, it is clear that [Claimant] will require additional physical rehabilitation/therapy and activity restrictions for an extended period (prior to potential return to gainful employment with restrictions). As a result, I am hereby recommending that [Claimant] be considered for a disability status. A 6 to 12 month period of rehabilitation and therapy are at hand, albeit I will continue to follow up with [Claimant] closely.

AR 504-505.

The ALJ found Dr. Jensen's opinions somewhat persuasive. The ALJ noted Dr. Jensen found that Claimant could not return to work as a nurse, which the ALJ suggested agreement with. AR 21. The ALJ found, however, that Dr. Jensen's opinions were of a temporary nature, provided no function-by-function analysis, and did not analyze Claimant's condition after she improved with physical therapy.

Substantial evidence supports the ALJ's determination that Dr. Jensen's opinions opined that Claimant could not return to work as a nurse, which is consistent with the ALJ's RFC determination. To the extent Dr. Jensen found Claimant could not walk more than 200 feet at a time (such that she needed handicapped parking), the ALJ limited Claimant to sedentary work, which does not require much walking. And as Claimant notes, even if inconsistent with the ALJ's RFC determination, the temporary nature of Dr. Jensen's opinion supports at most a closed period of disability—which I have found applicable.

### D. Some Medical Evidence and Development of the Record

Claimant argues (in a single sentence) that after rejecting the opinions of NP Pucelik and Dr. Jensen, the ALJ needed to order a physical consultative examination. Claimant accuses the ALJ of "playing doctor" by formulating an RFC unsupported by

any medical opinions. Claimant relies on cases holding that "[RFC] is a medical question" that must be supported by "[s]ome medical evidence."[49]

Claimant ignores the opinions of the state agency consultants, issued in April and August 2019. AR 70-73, 125-28. For the period after Claimant improved, these opinions, as well as the ALJ's analysis of the treatment records, support the ALJ's RFC determination.[50]

Claimant also argues that the ALJ erred by failing to develop the record and obtain treatment notes from her therapy sessions. "[T]he ALJ has an independent duty to develop the record in a social security disability hearing . . . ."[51] The ALJ must not leave "crucial issue[s] . . . undeveloped."[52] Here, by late September 2019, treatment records from Claimant's primary care provider reflect that her mental-health symptoms had stabilized and improved. But as I have already noted, the ALJ failed to develop a critical issue: whether Claimant was disabled for a twelve-month period prior to the

---

[49] *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *accord* **Combs v. Berryhill**, 878 F.3d 642, 646 (8th Cir. 2017).

[50] *See Kamann v. Colvin*, 721 F.3d 945, 948-51 (8th Cir. 2013) (rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ rejected the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist"); *Anderson*, *v. Shalala*, 51 F.3d 777, 779-80 (8th Cir. 1995) (holding that the ALJ's RFC determination was supported by substantial evidence when the ALJ relied on the opinions of two reviewing physicians; adopted some, but not all, of the limitations set forth by the treating physicians; and "conducted an independent analysis of the medical evidence"); *cf. Lauer*, 245 F.3d at 704-05 (rejecting the Commissioner's argument that the ALJ's RFC determination was based on the opinion of the non-examining reviewing consultant when the medical basis for the ALJ's decision was unclear and the non-examining reviewing consultant found fewer severe impairments than the ALJ); *Combs*, 878 F.3d at 646-47 (when state agency consultants' opinions differed, holding ALJ erred in relying on less limiting opinion and placing significance on treatment records showing "no acute distress" and "normal movement of all extremities," which had little relevance to limitations caused by plaintiff's rheumatoid arthritis).

[51] *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (quoting *Goff*, 421 F.3d at 791).

[52] *Id.* (quoting *Goff*, 421 F.3d at 791).

improvement of her symptoms. On remand, in determining when Claimant improved to the point where the closed period of disability ended, the ALJ should obtain Claimant's therapy treatment notes.[53]

### E. Appointments Clause

After briefing in this case was completed, I permitted Claimant to raise an Appointments Clause challenge via supplemental briefing, noting that the Government could raise its forfeiture argument in response. Doc. 27. Claimant's counsel filed almost identical supplemental briefs in several cases, arguing that Nancy Berryhill's service as Acting Commissioner violated the Federal Vacancies Reform Act (FVRA) and the Appointments Clause of the United States Constitution and that therefore her ratification of the ALJ's appointment in this case was invalid. I recently rejected all of Claimant's arguments in a thorough order (and declined to address the Government's forfeiture argument).[54] I adopt my prior reasoning and reject Claimant's challenge to the ALJ's appointment in this case.

## III.  CONCLUSION

I **reverse** the decision of the Commissioner and **remand** to the Social Security Administration for an award of benefits for a closed period and other further proceedings consistent with this order. Judgment shall enter in favor of Claimant.

**SO ORDERED** September 30, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[53] *See Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998) (finding the ALJ did not properly develop the record where the evidence clearly lacked relevant medical records).

[54] *Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022).